UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

BETH FREEMAN )
 )
v )   NO: 2:08-CV-35
 )   CONSOLIDATED
BLUE RIDGE PAPER )
PRODUCTS, INC. )

## MEMORANDUM OPINION AND ORDER

The defendant filed a "Second Motion for Summary Judgment as to All Claims–Failure of Proof and No Proximate Cause," [Doc. 139], on June 15, 2012. The defendant frames the issue as "[d]id Plaintiff provide sufficient eviden[ce] to create a genuine issue of material fact as to what the condition of the water in the Pigeon River is when it flows into Tennessee and through Cocke County, Tennessee." The defendant has rephrased the issue more specifically as follows: "[P]laintiffs in an environmental nuisance action should not be allowed to establish proximate cause without showing (1) the chemical composition, concentration, and origin of the alleged interference; and (2) the scientifically verifiable health risks created by the exposure." The defendant asserted at the August 23, 2012 hearing on the motion that expert proof is needed to show these two things. Of course, the plaintiff disagrees. For the reasons that follow, this Court agrees with the defendant. As such, the motion for summary judgment is **GRANTED**, [Doc. 139].

## I. Facts

The plaintiff and class members own real property along the Pigeon River in Cocke County, Tennessee. The defendant operates a paper mill in Canton, North Carolina, twenty-six miles upriver from the North Carolina-Tennessee state line. The defendant discharges effluent into the Pigeon

River pursuant to a permit issued by the State of North Carolina. Plaintiff alleges that this effluent contains "pollutants" that pose "dangers" and "chemicals" with "potentially adverse health effects." Defendant claims the water of the Pigeon River is "not adversely impacted by any action of the Canton Mill."

Plaintiff brings this action for private nuisance. She claims that "Defendant's annual discharges into the Pigeon River of tens of millions of pounds of chemicals in its effluent directly results in a substantial and unreasonable interference with Plaintiff and Class members' lands in Cocke County, Tennessee." However, plaintiff admits that she has no test data to support her claims.

Nonetheless, plaintiff disclosed several experts who she plans to call as witnesses. First, the plaintiff disclosed John McElligott, M.D., F.A.C.P., M.P.H. as a medical doctor specializing in occupational health and safety. He was expected to testify to the genotoxic effect of the mill's effluent and the plaintiff's fear of the river's water.[1] However, it is undisputed that Dr. McElligott has not tested the water in Tennessee. It is also undisputed that Dr. McElligott does not have any documents or materials that indicate what substances are in the water as it flows through Cocke County.

Second, the plaintiff intends to call Mr. Jerry Clark, CSP, CIH, a certified industrial hygienist. Mr. Clark was expected to testify to the genotoxic effects of the chemicals discharged by the mill. He admits, however, that he is "not aware of a scientifically designed, comprehensive environmental study of the quantity and concentrations of agents discharged in the Blue Ridge Paper

---

[1] On August 15, 2012, the United States Magistrate Judge filed an Order, [Doc. 249], granting Defendant's motion to exclude Dr. John McElligott from testifying at trial as an expert witness for the Plaintiff. The plaintiff has appealed this Order, [Doc. 271]. The Court has not yet ruled on this objection. However, for the purposes of this motion, the Court will assume that Dr. McElligott's testimony is admissible despite the magistrate judge's decision.

2

Product, Inc. waste stream into the Pigeon River and their downstream concentrations or environmental fate." Further, he made no attempt to quantify the actual or theoretical risk to the health of the downstream receptors.

Third, the plaintiff had disclosed plans to offer Mr. David W. Weekley, RPIH, as a witness. Mr. Weekley is a registered industrial hygienist who was to address the empirical sampling of water extracted from the river at various locations. His testimony was to address the quality of the water as it flows past the plaintiff's property. However, the plaintiff withdrew Mr. Weekley's name as one of her experts in her amended expert disclosures of April 16, 2012. On this same date, the plaintiff disclosed a laboratory report entitled "Pigeon River Study." It set forth analysis of water samples drawn from the Pigeon river on April 11, 2012. Neither Dr. McElligott nor Mr. Clark have reviewed this study.

Defendant's expert reports that there are no human health, human welfare or ecological health concerns that can be related to the mill due to the water quality of the Pigeon River. This expert opines that many Tennessee tributaries, which do not meet Tennessee water quality standards, contribute to the river's color, foam and substantive makeup. Another defense expert would testify that the mill's discharge does not represent a threat to human health in the Pigeon River. He further opines that there are numerous other dischargers downstream from the mill that affect the river. This expert analyzed the plaintiff's April 16, 2012 report and concluded that the samples from the river raise no concern for human health, ecological health or aesthetics. He further concluded that influences other than the mill have a detrimental effect on the river, namely Waterville Lake, Bethel and Cosby Schools, Newport treatment facilities, and runoff from urban and agricultural areas.

## II. Summary Judgment Standard

3

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800 (6th Cir. 2000). This Court's role is limited to determining whether the case contains sufficient from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could not return a verdict in favor of the non-moving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. *Id.* Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* A genuine issue for trial is not established by evidence that is "merely colorable," or by factual disputes that are irrelevant or unnecessary. *Id.* at 248-52.

### III. Analysis

Again, the plaintiff alleges that "'through operations at its pulp and paper mill . . . located upstream on the Pigeon River in Canton, North Carolina, [defendant] has substantially interfered with Plaintiff's and the proposed Class' rights to use and enjoy their downstream real property' by discharging 'waste, chemicals, and other contaminants into the Pigeon River,' making the river brown in color, odorous and often filled with foam.'" The defendant claims that the plaintiff cannot prove this private nuisance claim because plaintiff cannot establish that defendant's actions are the proximate cause of plaintiff's damages.

This Court must apply North Carolina substantive law in this case. In North Carolina, "[t]o recover in nuisance, plaintiffs must show an unreasonable interference with the use and enjoyment of their property." *Jordan v. Foust Oil Co., Inc.*, 116 N.C.App. 155, 167, 447 S.E.2d 491, 498 (1994) (citation omitted). "'The interference must be substantial and unreasonable. Substantial simply means a significant harm to the plaintiff and unreasonably means that it would not be reasonable to permit the defendant to cause such an amount of harm intentionally without compensating for it.'" *Whiteside Estates, Inc. v. Highlands Cove, L.L.C.*, 553 S.E.2d 431, 455-56 (Ct. App. N.C. 2001)

5

(quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 88, at 626 (5th ed.1984)).

The defendant argues the lack of proximate cause in two ways. First, it contends there is a lack of proximate cause as to the chemical composition, concentration, and origin of the alleged interference. In other words, defendant claims that the plaintiff cannot prove that the chemicals released by the defendant at the mill are chemicals that are present in the water as it flows by her property in Cocke County, Tennessee. Second, the defendant states that plaintiff cannot show the scientifically verifiable health risks created by the exposure to chemicals released from the mill. The defendant argues that to establish proximate cause in these two situations, the plaintiff must prove each of these by competent expert proof. Plaintiff counters that expert proof is not required because the facts in the case are such that any layman of average intelligence and experience would know what caused plaintiff's injuries. In other words, plaintiff in essence claims that chemicals dumped upstream by the mill necessarily flow downstream to Cocke County and beyond[2] and no expert testimony is necessary to establish their presence in the river in Cocke County or their concentration. Both parties cite several cases to support their respective positions. This Court has thoroughly reviewed the cases as well as some that were not cited by the parties. A short summary of the pertinent cases follow. Then the Court will address the first claim of the defendant, for it decides the motion.

Basically, the cases cited by the petitioner fall into one of two camps–well contamination cases or flooding cases. Within these two camps, there are cases that could arguably support either

---

[2] During argument on motions before the Magistrate Judge on September 5, 2012, plaintiff's counsel took the position that any landowner along any of the waterways through which the Pigeon River flows on its way to the Gulf of Mexico could maintain a nuisance action against Blue Ridge based on the discharge from the Canton mill and could always create a jury question without analytical testing to establish the chemical concentration in the water or expert testimony to establish that defendant's actions caused substantial damage to the landowner.

6

position. However, after analyzing the cases' various points of law and factual situations, this Court finds that the defendant's position must prevail.

The well contamination cases do not specifically address whether expert proof is necessary to determine proximate cause. In all of them, however, there was some form of expert proof, whether it was by testimony or reports. However, the cases are instructive on the amount of evidence needed to survive summary judgment based on causation.

In *Masten v. Texas Co.*, 140 S.E. 89 (N.C. 1927), the evidence showed that the defendants installed a gasoline tank and pump one hundred and thirty feet upgradient from the plaintiff's well. This tank was the only tank "within half a mile or more of the plaintiff's home," and the plaintiff's well became contaminated with gasoline after the installation of the defendant's gasoline tank. *Id.* at 90. The court found that this evidence was "more than a scintilla, and sufficient to be submitted to a jury." *Id.*

The North Carolina Supreme Court addressed a similar situation in *Wilson v. McLeod Oil Co.*, 398 S.E.2d 586, 602-03 (N.C. 1990). In that case, the defendants argued that they were not responsible for contaminating certain wells because the forecast of evidence indicated that defendants' site was downgradient from the wells. *Id*. at 602. The plaintiffs argued that:

> there could be a lower aquifer below the upper aquifer with a different flow direction from that of the upper aquifer ... [and] that the depositions of the experts do not foreclose the possibility of the existence of this lower aquifer whose flow direction might bring the contamination to the Hill and Pagura properties from the Mini-Mart property ... which is "downhill" from the Hill and Pagura properties.

*Id*. at 602. An expert testified by deposition that it was possible that a lower aquifer could run in a different direction. *Id*. The court held that evidence of the defendants' contaminated site as a "possible" source of the plaintiffs' contamination is a "slender reed upon which to base causation"

7

and an insufficient forecast of evidence. *Id*. The court stated that "[t]o allow a jury to consider the question of whether there is a lower aquifer flowing in a different direction, when the only expert testifying on this matter refuses to answer that very question based on the data collected, is improper." *Id*.

In *Ammons v. Wysong & Miles Co.*, 431 S.E.2d 524 (N.C. Ct. App. 1993), landowners sued an adjacent landowner seeking damages for well contamination allegedly caused by the adjacent landowner's manufacturing activities. Noting that causation is an element of the nuisance claim asserted by the plaintiff, i.e. that "in order to sustain an action for nuisance, a plaintiff must show that defendants' actions caused him substantial damage," *id*. at 528, the Court held, relying on *Wilson v. McLeod Oil Co.*, that expert testimony which established only that contaminants "could" travel to plaintiff's property, not that they actually traveled, was insufficient for plaintiff to avoid summary judgment. *Id*. at 528-29. However, in *James v. Clark*, 454 S.E.2d 826 (N.C. Ct. App. 1995), expert testimony identified the defendant's site as the only potential source of contamination for the plaintiff's well. Thus, this was sufficient to create a genuine issue of material fact.

The last well contamination case to discuss is *Ellington v. Hester*, 487 S.E.2d 843, 846 (N.C. Ct. App. 1997). In that case, the plaintiffs sued defendants for allegedly contaminating their well water with gasoline from defendant's underground storage tank. *Id*. at 843. The properties were adjacent to each other, and they shared a common aquifer. *Id*. When the plaintiffs noticed problems with their water, they contacted the Division of Environmental Management of the North Carolina Department of Environment, Health, and Natural Resources ("DEHNR"). *Id*. DEHNR performed several tests on the water samples taken and concluded that the plaintiffs' water contained components of gasoline and petroleum products. *Id*. at 843-44. Steve Williams, with DEHNR,

8

investigated the matter. *Id*. at 844. Two underground storage tanks ("UST") were located on the defendant's property. *Id*. Neither contained gasoline at the time of the investigation. *Id*. However, they had contained gasoline at one time, and they were located "a couple hundred feet upgradient from the Ellington well." *Id*. The USTs were subsequently removed from the defendant's property, and the soil tested around where the tanks had been located. *Id*. These tests revealed that gasoline had leaked from the larger tank. *Id*. The defendants then began procedures to clean up the site. *Id*. The next year, the plaintiffs filed suit for nuisance and other claims based on the presence of gasoline in their well water. *Id*.

At the end of the trial, the trial court granted the defendant's motion for a directed verdict, and the plaintiffs appealed. *Id*. The court of appeals upheld the trial court's decision. *Id*. at 845. The court stated:

> Here, the plaintiffs have failed to show that a release of gasoline from the UST located on the defendants' property caused the contamination in the plaintiffs' well water. Plaintiffs offered the testimony of several expert witnesses at trial. Steve Williams, a hydrologist employed by DEHNR, investigated potential sources of contamination of the plaintiffs' well water. Mr. Williams testified that the plaintiffs' well water was contaminated with gasoline and that soil tests indicated that there had been a release of gasoline from the defendants' 1000 gallon tank sufficient to leave "a strong odor of gasoline in the soil" removed from underneath the excavated tank. Although Mr. Williams testified that after he "looked around the area" he "didn't see any other possible source ... [o]f contamination," when asked if he was willing to state an opinion "that Mr. Hester's gasoline around there was the cause of the Ellington's problem," he answered that he did not have "sufficient evidence" to determine that the Hesters' UST was the source of the contamination of the Ellington well.
>
> The plaintiffs also offered the expert testimony of J.D. Barker, an environmental engineer employed by S & ME Environmental Consulting. Mr. Barker never actually visited either the Hester or the Ellington properties, but had reviewed the information collected by DEHNR. Mr. Barker testified that he had not been able to determine

9

> the direction of the ground water flow under the Hester property. He also testified that he was not aware of any contamination in the two wells located on the defendants' property and that "there's not been any contamination in the Williard well which is the next-door neighbor to the Ellingtons." Mr. Barker also testified that he had not "been able to identify the source of the contamination" of the plaintiffs' well. Furthermore, the S & ME "Preliminary Site Assessment" dated 23 February 1996 states "[a]t this time, there is insufficient data to identify the cause or combination of causes for the presence of groundwater contaminants" in the plaintiffs' well water.

*Id*. at 846

Thus, the court found that the expert testimony offered did not present sufficient evidence to establish a causal connection between the release of gasoline from the defendants' UST to the contaminants found in plaintiff's well. *Id*. at 847. None of the experts could testify definitively that the contamination actually came from the defendant's tank. *Id*. As such, the court held that plaintiffs had failed to present a sufficient forecast of evidence to survive the motion for summary judgment. *Id*.

The flooding cases do address whether expert proof is needed to establish proximate cause. Whether expert testimony is required to establish the element of causation in flooding cases differs based upon the complexity of the facts presented. *See Banks v. Dunn*, 630 S.E.2d 1 (N.C. Ct. App. 2006); *BNT Co. v. Baker Precythe Dev. Co.*, 564 S.E.2d 891 (N.C. Ct. App. 2002); *Davis v. City of Mebane*, 512 S.E.2d 450 (N.C. Ct. App. 1999). In *Davis v. City of Mebane*, the plaintiffs' properties were repeatedly flooded after a hydroelectric dam was constructed upstream from their respective properties. 512 S.E.2d at 451. The plaintiffs asserted it was due to the negligent design and location of the dam. *Id*. at 451-52. They solely relied upon lay testimony for proof. *Id*. The defendants argued that "lay testimony that there was no flooding before the dam was built and significant flooding after the dam was built [was] not sufficient to survive a motion for summary judgment."

10

*Id*. at 453. The North Carolina Court of Appeals held that "lay testimony would not be sufficient to explain changes in the watershed or in the downstream water flow." *Id*. The court held that expert testimony was required to establish causation "[w]here ... the subject matter ... is 'so far removed from the usual and ordinary experience of the average man that expert knowledge is essential to the formation of an intelligent opinion ... as to the cause of ... [the] condition.' " *Id*. (quoting *Gillikin v. Burbage*, 139 S.E.2d 753, 760 (1965)).

In *Banks* and *BNT*, the North Carolina Court of Appeals came to an opposite conclusion based on the facts of those cases. In *BNT*, the Court distinguished its facts from the facts presented in *Davis*. *Id*. at 895. There, the plaintiffs owned 12 acres immediately south of the defendant's 17.472 acre tract. *Id*. at 894. The defendant intentionally closed a drainage ditch located on its property, which caused repeated flooding and substantial damage to plaintiffs' properties. *Id*. at 894. Defendant's expert witness testified that the closing of the ditch had "an insignificant effect" on the plaintiffs' properties during the major storm events and that the flooding was due to "low elevation." *Id*. at 894. The defendant argued that the plaintiffs failed to prove causation by expert testimony. *Id*. at 895. The court stated that "[u]nlike the unusual circumstances in *Davis*, the facts of the instant case are such that a layperson could form an intelligent opinion about whether the flooding was caused by the closing of the ditch." *Id*.

The North Carolina Court of Appeals reached a similar decision in *Banks*. Plaintiff's property was located behind defendant's gas station at the bottom of a steep hill. 630 S.E.2d at 2. The property line was marked by a small waterway. *Id*. The defendant dumped sixty-eight truckloads of fill dirt on the hill behind the gas station. *Id*. The plaintiff claimed that her property had never flooded until the dumping of the dirt. *Id*. There was testimony from an environmental

11

specialist that in his opinion the dumping of the dirt caused the flooding. *Id*. at 3. The court distinguished the facts of the case from those in *Davis*, and held that expert proof was not required to establish causation, for the flooding "implicates no scientific principle more complex than the truism that water flows downhill." *Id*. at 4.

None of the cases are exactly on point. However, after considering the cases in conjunction, this Court gleans the following: (1) A plaintiff must offer competent proof that defendant's property or the defendant's actions were the sole source or cause of the contamination or interference; and (2) In so showing, a plaintiff must have expert proof of causation if the situation is complex, or beyond the usual and ordinary experience of the average man.

Here, the plaintiff's claim of nuisance is based on the quality of the Pigeon River's water. Essentially, the plaintiff argues that the defendant admits it discharges a very substantial quantity of substances into the water. The course of the river flows from the mill for several miles then by her house. The water in Cocke County has an objectionable odor, foam and color. Plaintiff admits that she has no evidence that the defendant caused any objectionable odor, foam or color in the water in front of her house. Moreover, the plaintiff has no expert who will testify that any chemicals or compounds in the defendant's effluent are even present in the water in front of her house and actually cause the odor, foam or color. The defendant's expert will testify that other sources which discharge into the water could cause such things.

This is not a situation where the plaintiff's and defendant's properties are adjacent and there are no intervening factors that could cause the problems complained of or be the source of the odor, foam or color. In addition, the analysis of an effluent's composition, examination of other sources' discharges into the water, and the study of chemical reactions of various compounds present in water

12

at various points along miles of a river to determine the causes of odor, foam or color at another specific place on the river are not simple examinations which a lay person could conduct. These determinations would have to be made in order to prove that the defendant's actions of discharging its effluent in North Carolina caused the interference complained of at the plaintiff's property in Tennessee. As stated above, the plaintiff cannot offer such proof. Accordingly, this Court finds that plaintiff has failed to present a sufficient forecast of evidence to survive the motion for summary judgment.

Plaintiff makes an additional argument that needs to be addressed. Plaintiff asserts that, even if expert testimony is required to prove a causal link between defendant's discharges from the Canton mill and plaintiff's alleged injuries, she has offered proof from a medical doctor and certified industrial hygienist who will testify to opinions that there are harmful substances in the Pigeon River and "that those substances can reasonably be traced to the Canton mill's discharges," creating a "classic battle of the experts" such that a jury must "evaluate what weight and credibility each expert opinion deserves."

Unfortunately for the plaintiff, this does not merely come down to a "battle of the experts" from which a jury must decide who it believes. According to the record presently before the Court, the plaintiff's experts never actually opine that chemicals from the mill actually reach Cocke County or cause a verifiable risk to the plaintiff class. For example, Jerry H. Clark, an industrial hygienist, offered the following opinions in his report:

> A brief review of the substances that are admittedly discharged into the Pigeon River by Blue Ridge Paper Products, Inc. shows that many of the substances **are suspected of or known to cause** genotoxic and/or carcinogenic effects.
>
> . . . .

13

> In my opinion, plaintiffs downstream from Blue Ridge Paper Products, Inc. have legitimate and reasonable concerns regarding the safe use of and access to the surface waters of the Pigeon River due to chemicals and agents discharged in the Blue Ridge Paper Products' plant effluent. It seems reasonable to conclude that these conditions **may** be causing a negative effect on the economic and emotional well being of those individuals whose lands abut the Pigeon River due to impaired opportunity to use the river resource to its fullest potential.

(Emphasis added.) Clark offers no opinion, however that the substances discharged from the Canton mill 26 miles upstream are present in the river when it reaches Cocke County (rather than from one of the other discharge points between the mill and Cocke County) nor is he able to say, even if the substances are present, what their concentration is.

Dr. McElligott, a medical doctor, offers the following opinions listed in the plaintiff's expert disclosures:

> (I) the chemicals/elements/compounds set forth above which are discharged into the Pigeon River by Blue Ridge Paper Products, Inc. **are known to cause** a myriad of acute, chronic, and/or genotoxic health problems;
>
> (II) the chemicals/elements/compounds set forth above which are discharged into the Pigeon River by Blue Ridge Paper Products, Inc. **have the potential to cause** a myriad of acute, chronic, and/or genotoxic health problems on people who live on, near, wade in, swim in, fish in, or sit in the Pigeon River downstream in Cocke County, Tennessee from the Canton Mill plant in North Carolina;
>
> (III) it would be reasonable for any landowner on the Pigeon River in Cocke County, Tennessee downstream from the Canton Mill plant to: (i) have a fear of being in contact with the water in the Pigeon River; and (ii) have a fear of using, drinking, eating from, or swimming in the Pigeon River.

(Emphasis added.) Dr. McElligott was questioned by the defendant about his opinions in his February 16, 2011 deposition. At that deposition the following exchange took place:

> 17    Q. Do you know the quantity of any

14

18    chemical that is contained within the paper mill's
19    discharge?
20    A. No.
21    Q. Is that something, as a medical
22    doctor, you would be interested in knowing?
23    A. Yes. I read your experts, and they
24    didn't know either. I was hoping I would find
25    something.

1     Q. The fact that a particular chemical
2     is present in the discharge at the paper mill, that
3·    doesn't necessarily mean that that chemical is
4     present when the Pigeon River water flows into
5     Tennessee, does it, sir?
6     A. If it's discharged in North
7     Carolina, and you are saying it's not in Tennessee?
8     Q. The fact that there may be a
9     substance or chemical in the discharge of the paper
10    mill in North Carolina doesn't equate to the fact
11    that that same chemical is in the water in
12    Tennessee, does it, sir?
13    MR. SCOTT: Object to the form.
14    **THE WITNESS: It does not equate to**
15    **it, but does not disprove it either.**
16    BY MR. KRIEG:
17    Q. What testing data have you seen of
18    what is contained in the water of the Pigeon River
19    in Cocke County, Tennessee?
20    A. There's been none done.
21    Q. What testing have you done?
22    A. None.
23    Q. What testing has anyone else done,
24    to your knowledge?
25    A. None, to my knowledge.

1     Q. Have you ever reviewed any data of
2     testing of water in Tennessee?
3     A. No.
4     Q. So it would surprise you to learn
5     that the Tennessee Department of Environment and
6     Conservation, through their tests, have determined
7     that there are no harmful effects either to aquatic
8     life or human life from the water in the Pigeon
9     River in Tennessee?

15

```
          10    MR. SCOTT: Object to the form.
          11    THE WITNESS: Have I read that?
          12    BY MR. KRIEG:
          13    Q. Would it surprise you to know that
          14    their tests have concluded that?
          15    A. No. I have seen some of their
          16    tests before that I vaguely remember when we did the
          17    previous case, but I don't know what the grade of
          18    the river is at this point in time, and I don't know
          19    that there's been any sediment testing done, that I
          20    have seen, and I think those are all still up in the
          21    air. Again, I have not reviewed the current
          22    literature on what's going on with the river, but if
          23    this proceeds further, I will certainly do that.
          24    Q. Do you have any documents or any
          25    materials that indicate what substances are in the

          1     water as it flows down the Pigeon River through
          2     Cocke County, Tennessee?
          3     A. No.
```

Deposition Pages 20-23 (emphasis added).

Based on the above evidence, this Court cannot conclude that the plaintiff has offered sufficient expert proof of a causal link between the discharges from defendant's mill and harm to the plaintiff class nor of the scientifically verifiable health risks created by the exposure to chemicals released from the mill in order to withstand summary judgment. The experts merely opine that chemicals like those discharged by the mill may or have been known to cause harmful effects. However, there is no testimony to show that the chemicals discharged from the mill, (1) are present in the water in Cocke County, Tennessee; and (2) are present in quantities which cause the health risks described.

## IV. Conclusion

For the reasons set forth above, the defendant's motion is **GRANTED**, [Doc. 139], and the class plaintiffs' case is **DISMISSED** on the merits.

16

So ordered.

ENTER:

                                                                  s/J. RONNIE GREER
                                               UNITED STATES DISTRICT JUDGE